UNITES STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | | |
|---|---|---|
| In re ACTIVE WEAR, INC., | ) | Bankruptcy Case No. 04-01780-WA4-11 |
| Debtor, | ) | |
| ACTIVE WEAR, INC., | ) | Adversary Proceeding No. 04-00049 |
| Plaintiff, | ) | |
| v. | ) | |
| PARKDALE MILLS, INC., | ) | |
| Defendant, | ) | |

## MEMORANDUM

This matter comes before the court on a complaint filed by the debtor-in-possession, Active Wear, Inc., ("the Plaintiff") seeking to recover and avoid a preferential transfer of personal property to Parkdale Mills, Inc., ("the Defendant"). On December 1, 2004, a trial was held before this court sitting without a jury. All post-trial briefs were filed as of March 10, 2005.

This court has jurisdiction over this adversary proceeding. 28 U.S.C. §§ 1334(a) & 157(a). This is a core proceeding. 28 U.S.C. § 157(b)(2). This court may render a final judgment.

1

## *Facts*

The Plaintiff is a corporation, wholly owned by Mickey T. Dunn, Kenneth R. Schrang, R. Wayne Hill and Tony E. Worthington ("the Insiders"). Pre-petition, the Plaintiff processed yarn into cloth goods. The cloth goods were then shipped to International Cutting, Inc., ("ICI") in Mexico where the cloth was cut in preparation for assembly as sports apparel, primarily t-shirts and sweatshirts. The cut goods were then sold to companies which sewed them into the sports apparel. A company named Major League, Inc., ("Major League") was the primary customer of the cut goods.

On or about February 13, 2004, the Plaintiff ceased operation and notified the Defendant of that decision. On that same date, the Defendant made a reclamation demand. Additional communications ensued between the parties and in early March the Defendant picked up a number of truckloads of yarn.[1]

Prior to the transfer of the yarn back to the Defendant, the Plaintiff owed the Defendant at least $2,000,000.00.[2] The Plaintiff charged $134,819.50 against the Defendant's account based on the return of the yarn.[3] The yarn that was returned pursuant to the reclamation demand was invoiced at $11,428.88. The parties have stipulated that the Defendant sold, or expected to sell at the time of this trial, the non-reclamation yarn for an amount between $99,000.00 and $105,000.00.[4]

---

[1] Trial Transcript, p. 111, testimony of Paul Huckfeldt.

[2] Parkdale eventually filed a proof of claim in the amount of $2,051,510.00.

[3] See Trial Transcript, p. 35, Testimony of Paul Huckfeldt, the Plaintiff's controller during its entire existence.

[4] See Trial Transcript, p. 10, and Plaintiff's Exhibit #12.

On May 5, 2004, an involuntary chapter 7 petition for relief was filed against the Plaintiff. Within twenty days of that date, the Plaintiff converted the case to a voluntary chapter 11 case. On May 25, 2004, the Plaintiff filed its schedules. The Plaintiff scheduled $4,386,000.00 in assets and $6,632,394.55 in liabilities[5].

On June 8, 2004, the Plaintiff filed the instant complaint seeking to avoid non-reclamation transfers and recover the value of the same for the benefit of the estate.

## *Discussion*

The Plaintiff seeks to avoid the transfer of the yarn to the Defendant as a preference under 11 U.S.C. § 547(b) and to recover the value of the same under 11 U.S.C. § 550. Section 547(b) provides that the trustee may avoid (1) a transfer of an interest of the debtor in property (2) that is made to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor before such transfer was made; (4) made on or within 90 days before the date of the filing of the petition if the transferee is not an insider; (5) made while the debtor was insolvent; (6) that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7 of this title, the transfer had not been made; and the creditor received payment of such debt to the extent provided by the provisions of chapter 7; (7) causing damages to the estate.[6]

---

[5]    See Plaintiffs schedules, also introduced as evidence as Plaintiff's Exhibit #4.

[6]    Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made–

The trustee has the burden of coming forward with evidence proving the avoidability of the transfer under subsection 547(b). See §547(g). The trustee or debtor-in-possession must carry the burden of proof by a preponderance of the evidence. 5 Collier on Bankruptcy, "Exceptions to Discharge", ¶ 523.04, p. 523-19 (15th ed. rev.) (And cases cited therein.)

The parties explicitly agree that the first four elements have been met. Consequently, it remains to be determined whether the Plaintiff has carried the burden of proof on the fifth and sixth elements. That is, the Plaintiff must prove that the transfer was made while the debtor was insolvent[7] and must prove that the transfer enabled the Defendant to receive more than it would have received if the case were a case under chapter 7, the transfer had not been made, and the Defendant received payment to the extent provided by the provisions of chapter 7. If the Plaintiff prevails on these two elements, it must then provide evidence of the value of the transferred property.

**Insolvency.** The first issue is whether the Plaintiff was insolvent at the time of the transfer. A debtor is insolvent if the sum of its debts are greater than the value of its non-exempt assets at fair evaluation. 11 U.S.C. § 101(32).[8]

The transfers in question occurred during the 90-day period pre-petition. The debtor is

---

                (A) on or within 90 days before the date of the filing of the petition; or
                (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
      (5) that enables such creditor to receive more than such creditor would receive if--
                (A) the case were a case under chapter 7 of this title;
                (B) the transfer had not been made; and
                (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

[7] As discussed below, the burden of going forward with evidence on the issue of insolvency shifts to the Defendant.

[8] This definition is usually referred to as the balance sheet test.

4

presumed to have been insolvent during the 90 days immediately preceding the date of the filing of the petition. 11 U.S.C. § 547(f). A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party to whom it was originally cast. Fed. R. Evid. 301 as made applicable by Fed. R. Bank. P. 9017.

How is a bankruptcy court to apply this rule in the context of section 547(f)? A presumption is rebutted, and has no further effect, once substantial evidence is introduced which would support a finding of the nonexistence of the presumed fact. The evidence must raise a substantial doubt in the mind of the trier of fact as to the existence of the presumed fact, the insolvency of the debtor during the 90-day period pre-petition. Russell, Bankruptcy Evidence Manual, 2005 Ed., § 301.3 (citing In re Cline, 282 B.R. 493 (Bankr. W.D. Wash. 2002)). While discussions on the effect of legal presumptions can and do fill chapters in treatises, in this case it means that the burden of going forward is shifted from the plaintiff to the defendant.

If the defendant successfully rebuts the presumption in section 547(f) by going forward with evidence that the debtor was solvent, then the plaintiff can only prove insolvency by carrying the burden or proof, Russell, Bankruptcy Evidence Manual, 2005 Ed., § 301.4 (and collected cases), under the preponderance-of-the-evidence standard.

In order to successfully rebut the presumption of insolvency, the Defendant must come forward with evidence that supports the construction of a balance sheet that indicates that the value of the Plaintiff's assets on the date of transfer were greater that the amount of the Plaintiff's liabilities. The Defendant has not done this. Rather, it has chosen to challenge some of the asset

values asserted by the Plaintiff.

In an effort to analyze the Defendant's evidence, we begin with the Plaintiff's balance sheet on or near the date of the transfers. On February 25, 2004, the Plaintiff assets were worth between $4,122,000.00 and $5,192,000.00. Its liabilities totaled between $6,549,000.00 and $10,127,000.00.[9] While some of the transfers did not occur on this date, they occurred closely in time to this date. A condition known to exist is presumed to have existed for a reasonable period of time prior and subsequent thereto. See In re Tuggle Pontiac-Buick-GMC, Inc., 31 B.R. 49 (Bankr. E.D. Tenn 1983) (Proof of insolvency six weeks after the date of the alleged transfer accompanied by proof of no substantial change in the interim, was evidence on insolvency on the earlier date.) See also In re Philadelphia Light Supply Co., 33 B.R. 734 (Bankr. E.D. Pa. 1983). Because the Defendant has not provided evidence of different point of departure, we begin with the amounts on Plaintiff's Exhibit 2.[10]

The Defendant divides its assertions in support of its contention that the Plaintiff was solvent at the time of the transfers into four groups: (1) the Plaintiff has prepared three separate sets of schedules which reflect three different valuations of assets; (2) the Plaintiff has failed to disclose certain assets owned by the debtor in the possession of other entities; (3) the debtor's balance sheets and income statements present contradictions; and (4) the debtor's financial statements in support of solvency are unreliable because the debtor's principles engaged in self-

---

[9]     See Plaintiff's Exhibit 2.

[10]    Paul Huckfeldt (the Plaintiff's controller) testified that the Plaintiff did not prepare a financial statement or income statement because the decision had been made to liquidate the company. See Trial Transcript, p. 23. The Plaintiff's January, 2004, balance sheet and May, 2004, balance sheet showed negative equity in the amounts of $855,000.00 and $1,370,000.00 respectively. See Plaintiff's Exhibits 7 & 8, and Trial Transcript, pp. 25 & 27.

dealing. These assertions taken together, even if all true, do not meet the Defendant's obligation to come forward with evidence rebutting the presumption of insolvency.

The Defendant first asserts that the Plaintiff has prepared three separate sets of schedules which reflect three different valuations of assets. The debtor prepared a balance sheet on February 25, 2004, May 25, 2004, and November 18, 2004. The first was prepared when the Plaintiff was attempting a liquidation without the oversight of bankruptcy. The second constitutes the debtor's original schedules. The third constitutes amended schedules that were prepared post-petition after many of the debtor's assets had been liquidated in amounts considerable less than the scheduled values.

The Defendant, however, does not assert that any particular adjustments to the debtor's balance sheets should be made based on this argument. The argument amounts to an allegation that the debtor has engaged in acts constituting bad faith. Such allegations, even if true, are not relevant to the issue of insolvency.

Second, the Defendant asserts that the Plaintiff failed to disclose the debtor's interests in assets owned by ICI and Major League. The Defendant asserts that the Plaintiff owns, or owned, all of the assets in the possession of ICI ("the Undisclosed ICI Assets"). Mr. Huckfeldt, the Plaintiff's controller, and now liquidating agent, testified at trial that the debtor owned certain equipment used by ICI in Mexico and that he made the offset. The Defendant has failed to present any evidence indicating the value of the ICI assets at the time of the transfers. Nor has it asserted the amount or explained the effect of the post-petition offset on the pre-petition character of the Plaintiff's balance sheet. The burden of coming forward with proof is on the Defendant, not the Plaintiff. Given the extent of the Plaintiff's negative equity at the time of the

transfers, some evidence of the value of those assets would be necessary for the Defendant to carry the burden of coming forward.

The Defendant also asserts that the Plaintiff paid overhead expenses for ICI in the amount of $50,000.00 per month. The Defendant also asserts that in June, 2004, the debtor offset certain accounts receivable from Major League against expenses incurred by Mr. Dunn, an insider of both the Plaintiff and Major League, in preserving assets of the estate ("the Offset"). It is unclear, and the Defendant does not explain, what affect these facts might have had on the Plaintiff's equity at the time of the transfers.

Third, the Defendant argues that the debtor's evidence concerning the value of its accounts receivable is contradictory as listed on balance sheets.[11] The debtor's accounts receivables varied as follows:

>    Jan. 2004:         $3,241,784.00
>
>    Feb. 25, 2004:     $2,200,000.00
>
>    May, 2004:         $1,516,515.00

The Defendant argues that this reduction resulted in part from an increase in the Plaintiff's discount of the accounts receivable. Again, it is unclear what adjustment the Defendant would have the court make to the Plaintiff's balance sheet in February.

Finally, the Defendant asserts that at or about the time that the Plaintiff was formed in 2002, the Insiders obtained equipment from VF Imagewear (East), Inc. ("VF Imagewear"). The Insiders then transferred their interest in the equipment to the Plaintiff for an equity interest in the

---

[11] The Defendant also argues that the evidence presented by the Plaintiff supporting its ability to pay its debts as they came due during the time of the transfers is not relevant. This is true but irrelevant as it constitutes nothing more than the destruction of a straw man.

Plaintiff. At or about the same time, the Insiders executed a promissory note ("the VF Note") in favor of VF Imagewear in the original face amount of $460,600.00 as consideration for the equipment.

In February of 2004, the balance due under the VF Note was about $300,000.00. On or about March 2, 2004, when it became apparent that the Plaintiff would not continue operating as an on-going entity, the Plaintiff transferred its accounts receivables due from Elcatex, a third entity, to VF Imagewear as payment on the balance of the VF Note. The terms of the transfer were memorialized in a writing which permitted VF Imagewear to collect the Eclatex accounts receivable up to the amount of $300,000.00. The transfer was made to the Defendant as payment in full of the balance due on the VF Note in the amount of $300,000.00[12] on the date of the transfer.[13]

At some point in time, Mr. Hill, on behalf of the debtor, executed an assumption agreement ("the Assumption Agreement") under which the Plaintiff agreed to assume the Insider's obligation under the VF Note. The agreement states that it "is effective as of November 23, 2002." Plaintiff asserts that the Assumption Agreement was executed in March 2002, not November, 2002. For purposes of this discussion, the court will decrease the debtor's assets by $300,000.00 in constructing the Plaintiff's balance sheet during the transfer period.

At or about the time of the transfer, the Plaintiff's assets were worth between

---

[12] The Transfer Agreement recited that the note evidencing the original indebtedness reflected principal in the amount of $281,481.00 and interest in the amount of $18,519.00.

[13] On May 5, 2004, the debtor filed a chapter 11 petition with the Clerk of the Bankruptcy Court. On June 8, 2004, the Plaintiff filed an adversary complaint ("the Complaint") with the Clerk of this Court seeking to recover a preferential transfer allegedly made to VF Imagewear (East), Inc., ("the Defendant") in the amount of $300,000.00.

9

$4,122,000.00 and $5,192,000.00. Its liabilities totaled between $6,549,000.00 and $10,127,000.00. If we give the Defendant the benefit of the doubt and accept the high valuation of assets, $5,192,000.00, and take the low amount of liabilities, $6,549,000.00, the Plaintiff was insolvent in an amount of approximately $1,357,000.00. Even if we remove the debt to VF Imagewear and adjust that amount by $300,000.00, the Plaintiff was insolvent under the balance sheet test. None of the Defendant's other arguments concern specific adjustments to either assets or liabilities on the date of the transfers.

The Defendant has failed to rebut the presumption that the Plaintiff was insolvent on the date of petition. The Defendant has not carried it burden of coming forward with evidence demonstrating that the debtor was solvent. Rather, the Defendant has, for the most part, criticized the evidence that the Plaintiff presented in support of insolvency. A Defendant does not meet its obligation to come forward with evidence rebutting the presumption of insolvency by questioning the Plaintiff's evidence on cross-examination. The Defendant must put forward its own evidence.

> The entire sum and substance of Fiber-Lite's [the defendant's] "rebuttal" of MAP's [the plaintiff's] insolvency is its counsel's cross-examination of Mr. Miller [an accountant] as to the lack of "specific figures"--appraisals--corroborating Mr. Miller's opinion of the value of MAP's assets. (N.T. at 24.) Mr. Miller responded that, "having liquidated many assets and many companies," his conclusion that MAP would realize less than $100,000 for its single use equipment was based on the prior offers received for the company's assets in West Virginia. (N.T. at 24-25.)
> Fiber-Lite came forward with no direct evidence--either during its cross-examination of Mr. Miller or in its case in chief--to establish the actual value of MAP's recorded assets or its solvency. The cross-examination of Mr. Miller amounted to no more than the type of speculation that the above-cited decisions have warned against accepting as sufficient evidence to rebut the presumption created by the Code. Therefore, I find that [Bankruptcy] Judge Twardowski did not err in finding that Fiber-Lite failed to rebut the presumption of insolvency established by MAP's evidence and that MAP was insolvent in the 90 day period prior to filing its petition.

10

In re Molded Acoustical Products, Inc., 150 B.R. 608, 614 (E.D.Pa. 1993), order affirmed 18 F.3d 217 (3rd Cir. 1994). The Defendant's evidence serves only as rebuttal of the Plaintiff's evidence. The Defendant has not met the burden of coming forward with evidence of the Plaintiff's solvency.

**Liquidation Test.** Under this element, the court must determine whether the transfer enabled the Defendant to receive more than it would receive if the case were a case under chapter 7 of this title, the transfer had not been made; and Defendant received payment of its claim to the extent provided by the provisions of chapter 7. In other words, would the Defendant's claim have been paid in full if the transfer had not occurred. The date of analysis is the date of petition. Collier, Preferences, ¶ 547.03[7], p. 547-44 (15th rev. ed.). The Plaintiff's schedules indicate that the debtor's assets on the date of petition. The Plaintiff scheduled $4,386,000.00 in assets and $6,632,394.55 in liabilities. The debtor scheduled general unsecured claims in the amount of $4,967,051.99. Because the unsecured claims exceed the debtor's assets, no unsecured creditor would receive 100% of its claim if this were a case under chapter 7.

Additionally, Mr. Huckfeldt, the Plaintiff's controller testified that the general unsecured creditors, of which the Defendant's is one, would receive less that 5% of their claims[14]. This testimony was uncontroverted at trial.

The Defendant's argues that the Plaintiff's nondisclosure of assets and inexplicable failure to investigate and pursue those assets establishes the failure of the Plaintiff to prove that the Defendant received more as a result of the return of the yarn than it would have received had

---

[14] Trial Transcript, p. 44. It is clear from the exchange that this percentage concerns unsecured, not all, creditors.

this case been administered under Chapter 7 by a disinterested trustee. Again, the Defendant does not present evidence identifying and valuing the alleged assets with any degree of specificity.

**Valuation.** The plaintiff argues that the amount of the preference is the value of the yarn in the hands of the Defendant. In support of this proposition, the Plaintiff cites First Software Corp. v. Computer Associates International (In re First Software Corp.), 107 B.R. B.R. 417 (D.Mass 1989) in which the District Court affirmed the Bankruptcy Court's valuation of the preference at the value of the transferred property in the hands of the transferee Defendant.

This court declines to follow that opinion. First, the Court's opinion in First Software focused on whether the value of the property in the hands of the transferee was the opportunity cost of the property (the cost of producing replacement disks[15]) or the retail value of the property. The opinion assumed that, but did not discuss whether, the transferred property is to be valued in the hands of the debtor or the creditor transferee. Second, the opinion in First Software constitutes persuasive, not mandatory authority. Finally, it contradicts the mandatory Fourth Circuit authority discussed below.

The Defendant argues that the measure of damages is the amount to which the debtor's estate was diminished as a result of the preferential transfer. The Defendant cites In re Decker, 329 F.2d 836 (4th Cir. 1964) for the proposition that the amount of the preference is the liquidation value of the property in the hands of the Plaintiff.

---

[15] The First Software Court referred to the property as "software". This Court can only assume that the First Software Court was referring to disks, not software programs, given the facts and the state of technology at the time of the opinion.

In <u>Decker</u>, a case decided under the Bankruptcy Act of 1898 as amended[16], the debtors (the Deckers) built a community swimming pool. As part of their compensation they received the right to the payment of 45 initial membership fees, which were set at $200.00 each. As a result of financial problems, the Decker's bank accounts were overdrawn by approximately $9,496.51. Mr. Decker's sister agreed to pay the bank $8,000.00 toward the overdrafts. In return, the debtors assigned their interest in 45 initial membership fees as security for the loan. Shortly thereafter, an involuntary petition was filed against the debtors and they were adjudged to be bankrupt. The trustee brought an action seeking to avoid and recover the $8,000.00 payment as a preference. The referee held that the $8,000.00 payment constituted a voidable preference. The United Stated District Court affirmed the decision.

The Fourth Circuit Court of Appeals reversed, holding that the amount of the preference was the value of the 45 initial membership fees that Mr. Decker had assigned to his sister, not the amount of the benefit to the creditor, the $8,000.00 payment. The Court held:

> In the instant case, the value of the swimming pool rights assigned to [Mr. Decker's sister] was brought into sharp focus by the disagreement of the parties but the question as to value remains unanswered. The fact that there was a preference which involved a depletion of the bankrupt's estate to some undisclosed extent does not necessarily require that the preferred creditor shall return all that he has received unless the amount of depletion is at least equal to the amount so received. The test is not what the creditor receives but what the bankrupt's estate has lost. *It is the diminution of the bankrupt's estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer.* As was pointed out by the Supreme Court in <u>Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co.</u>, 229 U.S. 435, 444, 33 S.Ct. 829, 831, 57 L.Ed. 1268 (1913), 'The fact that what was done worked to the benefit of the creditor, and in a sense gave him a preference, is not enough, unless the estate of the bankrupt was thereby diminished.'

<u>Decker</u>, 329 F.2d at 840. (Emphasis added.) The Fourth Circuit remanded the matter to the

---

[16] Opinions under the Bankruptcy Act of 1898 tend to retain their vitality under the Bankruptcy Code of 1978 unless specifically overruled by subsequent legislation or mandatory authority.

13

bankruptcy referee for a determination of the value of the swimming pool rights that were assigned to Mr. Decker's sister.

The Plaintiff asserts that Decker can be distinguished from the case at bar in that the Decker Court held that the amount of the recoverable transfer was limited by the amount of value actually transferred from the debtor to a third party payor. The assertion is true but the distinction does not concern that portion of Decker which guides this court. In reaching its ultimately holding, the Decker Court necessarily held that the "test is not what the creditor receives but what the bankrupt's estate has lost. *It is the diminution of the bankrupt's estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer.*" Id. This Court cannot agree with the Plaintiff's argument given this language. Preferential payments give rise to a cause of action not because one transferee creditor receives more, but because other creditors receive less.

The question then is this: To what extent did the transfer of the yarn diminish the liquidation value of the bankruptcy estate? At the time that the yarn was returned to the Defendant, the Plaintiff had ceased operations and was in the process of liquidating its assets. As such, the Plaintiff would not have received as much for the yarn as the Defendant would have, if it had sold that yarn instead of returning it. The Plaintiff has admitted that the value of the yarn in its possession was insignificant. On or about March 30, 2004, the Plaintiff's attorneys circulated a memorandum entitled Memorandum # 3, which stated in part:

> The Company has returned in excess of 100,000 pounds of inventory to Parkdale. Parkdale has not yet issued credits. In liquidation, the value of yarn inventory would be insignificant.[17]

---

[17] Defendant's Exhibit #8, p. 2-3.

On February 25, 2004, before the yarn was returned, Mr. Huckfeldt prepared a preliminary liquidation analysis that estimated the debtor's entire inventory, included property other than the yarn, at $25,000.00 to $50,000.00.[18] Mr. Huckfeldt testified that the yarn returned to Parkdale constituted roughly 80% of the Debtor's yarn inventory.[19] This means that the value of the yarn returned to Parkdale would have been $20,000.00 to $40,000.00. The reclamation yarn represented 8.47 % of the yarn returned.[20] So the liquidation value of the non-reclamation returned yarn is between $18,306.00 and $36,712.00 according to the testimony of the Plaintiff's controller. When given such evidence, courts must often estimate the value of property. In this

---

[18] Plaintiff's Exhibit 2. The following exchange occurred at trial.

Q: [Counsel for the Defendant] February 25, 2004, you shut down on February 13, and the inventory numbers here. How could this probably exclude the inventory that you returned to vendors?

A: [Mr. Huckfeldt] Okay. I see where you're going. That value was placed on Activewear.

Q: The value to Activewear if Activewear sold in liquidation?

A: Right.

Q: Activewear doesn't have the channels of distribution that Parkdale or other vendors that receive returned merchandise would have to redistribute goods, products, or event portions of product, partial cones or partially opened packages like a company that's in the business of selling these products?

A: Right. It could realize a higher value that a company who is going out of business and who is liquidating their inventory.

Q: So you agree that Activewear was not – in your judgment was it possible for Activewear to receive on February 25, more than a low of $25,000 or a high of $50,000 for whatever raw materials or inventory it had remaining.

A: That was an estimate based on limited experience and limited ability, yes.

Trial Transcript, pp. 121-122.

[19] Trial Transcript, p. 34.

[20] The returned yarn was invoiced at a value of $134,819.50. The invoice amount of the reclamation yarn was $11,428.88. If we assume that the reclamation yarn would have yielded the same amount in liquidation as the rest of the returned yarn (a logical conclusion), then we may conclude that the reclamation yarn constituted $11,428.88/$134,819.50 = 8.47% of the total yarn.

15

case, the value of the diminution of the estate caused by the preferential transfer is set at the midpoint of the two values, $27,459.00.[21]

The Plaintiff argues that "unless Parkdale is required to disgorge the full amount it received from the sale of the returned year, it is receiving a windfall at the expense of the other creditors of the bankruptcy estate. That is precisely the result § 547(b) is intended to prevent." As noted by the court in Decker, this is simply incorrect. The purpose of section 547(b) is not to avoid a possible windfall to the transferee creditor, rather it is to avoid the reduction in distribution to other creditors caused by the transfer. Indeed, if the value of the transferred property were greater in the hands of a debtor than in the hands of the transferee creditor, then the creditor would be required to either return the property or pay the debtor-in-possession an amount equal to the price that the debtor-in-possession could have received for the property.

## Conclusion

Judgment shall be entered in favor of the Plaintiff in the amount of $27,459.00.

Upon entry of this memorandum, the Clerk shall forward a copy to Patrick T. Fennell, Esq., counsel for the Plaintiff, and to Deborah L. Fletcher, Esq., counsel for the Defendant.

Entered on this 13th day of May, 2005.

William E. Anderson
United States Bankruptcy Judge

---

[21] This procedure is not the same as splitting the difference between the competing values asserted by opposing parties. Rather it is the reduction of a range of values to a single value, as is required for resolution of the dispute.